## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

EARL JEROME CAIN,               )
                               )
Plaintiff,                      )
                               )
vs.                             )    NO. 2:04-CV-347
                               )
ELGIN, JOLIET & EASTERN         )
RAILWAY COMPANY,                )
                               )
Defendant.                      )

## OPINION AND ORDER

This matter is before the Court on Defendant Elgin Joliet & Eastern Railway Company's (EJ&E) Motion for Summary Judgment, filed by Defendant, EJ&E, on October 3, 2005.  For the reasons set forth below, the motion is **GRANTED IN PART and DENIED IN PART**.  The motion is **GRANTED** as to Plaintiff's claims for harassment on the basis of his race in violation of section 1981 and Title VII (Counts I and V), and Plaintiff's defamation claim (Count IV), and the Clerk is **ORDERED** to **DISMISS** those claims **WITH PREJUDICE**.  The motion is **DENIED** as to Plaintiff's claims of discrimination in violation of section 1981 and Title VII (Counts I and V), and retaliation in violation of section 1981 and Title VII (Counts II and VI), and these claims remain pending.

BACKGROUND

Plaintiff alleges in his second amended complaint that he was harassed by his employer, EJ&E, on the basis of his race (African American), in violation of 42 U.S.C. section 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e *et seq.* (Counts I and V); discriminated against because of his race in violation of section 1981 and Title VII (Counts I and V); retaliated against in violation of Section 1981 and Title VII (Counts II and VI), and defamed (Count IV).[1]  Defendant EJ&E has moved for summary judgment on each of the remaining claims.

EJ&E argues that Plaintiff's harassment claim should be dismissed because:  (1) the claim is time-barred; (2) Plaintiff has not alleged facts sufficient to rise to the level of severity or pervasiveness required to establish a hostile work environment; (3) EJ&E exercised reasonable care to prevent and deal with any purported harassment; and (4) Plaintiff failed to exhaust his administrative remedies with respect to his harassment claim.

With respect to Plaintiff's discrimination claim, EJ&E contends that it should be dismissed because:  (1) Plaintiff cannot establish a *prima facie* case of unlawful discrimination; (2)

---

[1] This Court dismissed Plaintiff's claim of intentional infliction of emotional distress (Count III) on September 6, 2005.

-2-

Plaintiff cannot establish that EJ&E's legitimate non-discriminatory reason for assessing discipline against him was pretextual; and (3) Plaintiff's claims with respect to discipline which occurred in 2000 and earlier are time-barred.

Regarding Plaintiff's retaliation claim, EJ&E argues it should be dismissed because:  (1) Plaintiff cannot establish a *prima facie* case of retaliation; (2) Plaintiff cannot establish that EJ&E's legitimate, non-discriminatory reasons for assessing discipline and ultimately terminating Plaintiff was pretextual; and (3) Plaintiff's claims with respect to retaliation from 1999 and early 2000 are time-barred.

Finally, EJ&E contends that Plaintiff's defamation claim should be dismissed because:  (1) it is preempted by the Railway Labor Act; (2) the "statements" Plaintiff identifies are absolutely privileged; and (3) Plaintiff has failed to identify any defamatory statements. The issues in this case have been fully briefed and are ripe for adjudication.


DISCUSSION

The standards that generally govern summary judgment motions are familiar.  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v.*

*Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record must reveal that no reasonable jury could find for the nonmovant.  *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant.  *Anderson*, 477 U.S. at 255; *NUCOR Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).  "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (emphasis in original) (citing *Anderson*, 477 U.S. at 248).

-4-

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Undisputed Facts

Plaintiff was hired by EJ&E on November 3, 1997, as an electrician with the Locomotive Department. When Plaintiff started working at EJ&E, his immediate supervisor was John Juriss, supervisor of maintenance. During his employment, Plaintiff claims he was made aware of the following racial slurs made by Juriss: (1) Dieter Hilltrop, a co-worker, told Plaintiff that sometime in the mid-90's Juriss stated words to the effect of "[t]he problem in this country are the Jews and the niggers." (Pl.'s Dep., p. 57.); (2) in approximately the Spring of 1995, Juriss told Hilltrop that "Hitler

-5-

should have killed more Jews."   (Pl.'s Resp. to First Set of Interrogs., No. 1.); (3) one of three co-workers (Plaintiff is unsure which one) reported to Plaintiff that Juriss imitated a monkey in the work area, with racially derogatory implications, however, Plaintiff did not see the display himself. (Pl.'s Dep., pp. 59-60.); (4) Juriss told Plaintiff directly that Plaintiff reminded him of the "Taco Bell dog" and referred to him as a "spider monkey." (Pl.'s Dep., p. 76.); (5) Juriss said words to the effect of "in the war with Iraq, they should have killed more babies over there." (Pl.'s Dep., p. 76.); (6) one of three co-workers told Plaintiff in approximately 2000 that Juriss said, in reference to Plaintiff, "fucking buffalo heads, they are all alike." (Pl.'s Dep., pp. 58-59; Pl.'s Resp. to First Set of Interrogs., No. 1.); and (7) one of three co-workers told Plaintiff in approximately 2000 that Juriss called him a "dumb ass nigger." (Pl.'s Dep., p. 58; Pl.'s Resp. to First Set of Interrogs., No. 1.)

In June of 1999, Plaintiff and two of his co-workers met with Timothy Williams, the head of their department, to report Juriss' behavior. (Roberts' Dep., pp. 15-18, 141, Dep. Ex. A; Pl.'s Dep., p. 62; Adams' Aff., ¶ 4.)  Following the meeting, Plaintiff claims it did not appear that Williams did anything in response to Plaintiff's complaints about Juriss, although Williams claims he spoke to Juriss and told him the behavior was unacceptable. (Williams' Dep., p. 145; Pl.'s Dep., p. 62-64; Adams' Aff., ¶ 4; Roberts' Dep., p. 126.)

Plaintiff claims as a result of his complaints to Williams about

-6-

Juriss, he was subjected to various types of unjust discipline. Electricians in the Mechanical Department are subject to the General Regulations and Safety Rules Governing Mechanical Department Employees. (Wolfe Dec., ¶ 7.) Discipline is primarily administered by a demerit system, whereby an accumulation of 100 demerits will be considered as evidence that an employee has not rendered satisfactory service, and will result in dismissal. (EJ&E Notice, #D404.) Additionally, "[m]ajor offenses such as disloyalty, **dishonesty**, desertion, intemperance, immorality, insubordination, incompetency, willful neglect, inexcusable violation of rules resulting in endangering or destroying company property, making false statements, or concealing facts concerning matters under investigation, may subject the offense to dismissal, regardless of demerits." *Id.* (emphasis added.)

The Mechanical Department has a set of rules titled "The Elgin Joliet & Eastern Railroad Company General Regulations and Safety Rules Governing Mechanical Department Employees" ("Safety Rules") that apply to all the employees in the department, including managers and supervisors. (Chambers' Dep., pp. 58-59; Safety Rules, Ex. Q .) Rule S-1 of the Former Safety Rules states in part that:

> Civil and courteous conduct is demanded of all employees in their dealings with one another. Boisterous, profane, vulgar or Employees who are insubordinate, dishonest, immoral, quarrelsome, or otherwise vicious, or who are careless of the safety of themselves or others, or who are negligent in the performance of their duties, or who do not have or fail to exercise good judgment

will not be retained in the service.

(Ex. R, #D166-67.)

Generally, discipline that can be imposed by EJ&E includes verbal reprimands, written reprimands, demerits, suspension, and dismissal. (Williams' Dep., p. 70.)  Demerits are issued when an investigation or disciplinary hearing is held and an employee is found to be responsible as charged for a rule infraction.  (Williams' Dep., p. 73.)

The procedures for assessing demerits, disciplining and discharging electricians (such as Plaintiff), are set forth by both the Railway Labor Act, 45 U.S.C. sections 151, *et seq*. ("RLA"), and the collective bargaining agreement ("CBA") between the International Brotherhood of Electrical Workers (which Plaintiff is represented by), and EJ&E.  (Wolfe Dec., ¶ 6; EJ&E Notice, #D404.)  Rule 53 of the CBA provides that an employee cannot "be disciplined without a fair hearing by a designated officer of the Carrier [EJ&E]."  (#D308.)  A hearing officer presides over the investigation and he alone decides whether discipline is warranted based upon the testimony and the evidence.  (Wolfe Dec., ¶ 9; Chambers' Dep., pp. 84-85.)

Generally, the department manager (such as Williams for the locomotive department or Chambers for the car department), serves as the hearing officer in cases involving that department's employees. (Chambers' Dep., p. 91.)  Chambers, who was the hearing officer in two of the hearings regarding Plaintiff, does not recall finding in favor

of an employee in any hearing in which he was the hearing officer in the last five years.  (Chambers' Dep., pp. 95-96.)  Similarly, Williams could not say if he ever ruled in favor of an employee in any hearing in which he sat as the hearing officer for five years.  (Williams' Dep., p. 130.)  The employee may appeal a hearing officer's decision to a Public Law Board ("PLB"), which is a neutral body established by the RLA with jurisdiction to settle grievances between carriers and unions.  *See* 45 U.S.C. § 153; *United Transp. Union v. Norfolk & Western Ry. Co.*, 754 F.2d 525, 526 (4th Cir. 1985).

EJ&E also has a proficiency program - each supervisor is to conduct proficiency tests, formally and informally, on his employees throughout the year.  (Chambers' Dep., p. 63.)  If an employee fails a proficiency test (meaning he was seen violating the rules), he should be told of the violation, and an employee who fails a proficiency test can receive a verbal reprimand, a written reprimand, or no reprimand at all.  (Hill's Dep., p. 20; Williams' Dep., p. 114.)  These verbal reprimands, written reprimands, and failed proficiency tests do not require specific procedures, such as a disciplinary hearing, before being issued.  (Williams' Dep., pp. 31-32.)

It is undisputed that EJ&E managers have discretion in disciplining employees, including whether or not to discipline an employee.  (Roberts' Dep., pp. 28, 30.)  Not every employee who violates a rule is disciplined at EJ&E, and not every employee that makes a mistake is disciplined.  (Roberts' Dep., pp. 31-32.)  The

supervisor has the discretion to decide whether a verbal or written reprimand should be issued against an employee, and disciplinary decisions are based on a case-by-case basis. (Williams' Dep., pp. 71-73.)  Williams admitted that "if you dismiss every individual that violated one of these things [in Rule S-1] . . . there would not be anybody working for the railroad."  (Williams' Dep., p. 103.)  Managers or supervisors also have discretion in deciding whether to fail an employee on a proficiency test.  For example, a supervisor might observe a safety violation, but decide not to fail the employee on a proficiency test.  (Chambers' Dep., pp. 75-76.)

Regarding Plaintiff's discipline, shortly after he first complained about Juriss' behavior, Plaintiff first failed a proficiency on August 3, 1999, when Plaintiff violated EJ&E Rule 37, which requires employees to take certain protective measures while working on a track, including placing a blue flag and lock on the track ("the blue flag rule").  (#D737-738; #D26-27.)  Plaintiff was issued a verbal warning and no investigation ensued.

Approximately one month later, Plaintiff received his first formal discipline during his employment at EJ&E.  (Wolfe's Dep., p. 69, Dep. Ex. F.)  Plaintiff accepted responsibility for being negligent in his duties because of a traction motor failure that occurred on July 21, 1999, and his failure to discover a mechanical flaw in a locomotive during an inspection on July 28, 1999. (#D726-28, #D732, #D721-22,)  On September 9, 1999, Plaintiff was issued 3

demerits for the traction motor failure and 10 demerits for the inspection. (*Id.*) Juriss admitted to Hart Roberts, Plaintiff's co-worker and a union representative, that he made these accusations against Plaintiff because Juriss was trying to teach Plaintiff a lesson. (Roberts' Dep., pp. 148-49.)

On February 2, 2000, Plaintiff was charged with being absent from work without permission and failing to perform assigned duties. (#D716.) Williams held an investigation, served as the hearing officer, and ruled that Plaintiff was guilty of the accusations and assessed Plaintiff 30 demerits. (Pl.'s Dep., p. 43; Williams' Dep. Ex. K.)

On April 3, 2000, Williams accused Plaintiff of making a false statement in connection with a disciplinary hearing for another employee, at which Plaintiff testified. During that hearing, Plaintiff testified that he changed the fuel pump brushes on Locomotive 319. (#D861-862.) However, EJ&E later discovered that Locomotive 319 was not at the Gary location, therefore Plaintiff could not have performed the work he claimed. (#D709.) Thus, EJ&E scheduled an investigation which began on May 17, 2000, but was recessed at the request of Plaintiff's representative. (#D1242; #D1254-1255.) During the recess, Plaintiff admitted that he made an unintentional false statement (the Locomotive number was actually 312), and he was assessed 30 demerits. (Pl.'s Dep., p. 46, Dep. Ex. 1.)

By June 2000 (approximately one year after Plaintiff reported Juriss' behavior to Williams), Plaintiff had 73 demerits. Plaintiff received no demerits for the following two and a half years. His demerits were reduced, pursuant to policy, because of his clean record. Thus, Cain's 73 demerits on June 2000 were decreased by 10 in June 2001 and reduced by 20 in June 2002. By June 2002, Plaintiff was down to 43 demerits on his record. (#D1154.)

On April 11, 2000, Plaintiff called EJ&E's hotline to complain about what he believed was Juriss' continuing racist behavior and the retaliation he was experiencing. (Pl.'s Dep., pp. 61-62, 64; Dalton's Dep. Ex. A.) Plaintiff made his complaints to Dalton, the local human resources representative. (Pl.'s Dep., pp. 61-61; Dalton's Dep., p. 12.) Dalton began an investigation, interviewed Plaintiff and other coworkers about Juriss' behavior, and in approximately late May 2000, Dalton concluded that Juriss had violated EJ&E's harassment policy. (#D806-07; Dalton's Dep., pp. 87-88, Dep. Ex. B; Pl.'s Dep. Ex. 4; Dalton letter to Juriss dated June 30, 2000 (Ex. NN).) Accordingly, EJ&E issued Juriss a written reprimand, transferred him to a different department, required him to apologize to the employees involved (including Plaintiff), and required him to attend outside training. (#D806-07, #D809-811, #D872-875; Pl.'s Dep., p. 71; Wolfe Dec., ¶ 10.) Dalton does not recall making any determination on Plaintiff's complaint of retaliation. (#Dalton's Dep., pp. 79, 81, 93, 113-14, Dep. Ex. J.)

Plaintiff claims that following his complaints to human resources, EJ&E continued to discriminate and retaliate against him. Plaintiff was accused of violating the blue flag rule on October 1, 2002, when he was working on a caboose. Plaintiff claims he did have protection on when hooking up the caboose's battery to a charger, but after it was moved to another track, Plaintiff just plugged the electrical cord (extending outside the window of the caboose), into another outlet. (Pl.'s Dep., pp. 81-84.) Because Plaintiff was not on the caboose when he plugged in the cord after the move, he believed the blue flag was unnecessary. (*Id.*) After the caboose was moved and Plaintiff had plugged in the cord, Dave Hill, an assistant supervisor, sent Bolton over to Plaintiff to tell him to erect the blue flag protection. (Pl.'s Dep., p. 84; Hill's Dep., pp. 11, 33.) Plaintiff admits that Hill told him to put up the blue flag protection, but he explained to Hill he was not doing any work on the caboose at the time, so the blue flag was unnecessary. (Pl.'s Dep., p. 84.) Later, Hill noticed that Plaintiff had not installed a blue flag, and he wrote Plaintiff up on a proficiency for violation of the blue flag rule. (Hill's Dep., p. 32; Pl.'s Dep. p. 85.) Hill admitted he did not know when the caboose had been moved, and had not observed how the cord was put into place outside of the caboose. (Hill's Dep., p. 32.)

Hill testified that Plaintiff is the only employee he ever failed on a proficiency test. (Hill's Dep., p. 45.) Hill told Williams that he failed Plaintiff on a proficiency test, and Williams directed Hill

to write down what happened because he was going to charge Plaintiff, and Williams started another investigation. (Williams' Dep., pp. 133-34, 136; Hill's Dep., pp. 36-37; 40.) During the hearing, other witnesses corroborated Plaintiff's statements that the caboose was moved to another track after Plaintiff worked on it, and that Plaintiff only took the cord (already passed through the caboose's window), after the caboose was moved and plugged it into the wall. (Tr. of Disciplinary Hearing, #D915-17, #D924.) Nevertheless, Chambers, the hearing officer, held that Plaintiff violated the blue flag rule and assessed 30 demerits. (Pl.'s Dep., p. 98; Chambers' letter to Plaintiff dated January 6, 2003.)[2] Plaintiff's demerits were therefore back up to 73.

On October 2, 2002, the day after Plaintiff failed on the proficiency for the blue flag violation, Plaintiff was accused of dishonesty. That day, Plaintiff and a co-worker, Raymond Adams, saw a truck pass by with propane tanks loose in the back. (Adams' Aff., ¶ 6.) The truck was driven by two car department employees, Richard Leyba and Don Dombrowski.[3] Plaintiff believed the propane tanks

---

[2]On March 23, 2004, the PLB eventually reversed Chambers' decision that Plaintiff had violated the blue flag rule, finding Plaintiff's testimony was "corroborated by two other witnesses, and there [was] simply no showing to justify discounting their testimony, let alone [Plaintiff's]." (PLB No. 6702, Ex. AA.)

[3]Plaintiff claims that Leyba and Dombrowski were disciplined as a result and received verbal reprimands and a formal letter of reprimand. (Chambers' Dep., pp. 99-100.) However, Leyba stated he never received any type of verbal or written warning, or reprimand, or any discipline whatsoever. (Leyba Aff., ¶ 5.)

should have been secured, so he reported the loose tanks to Hill. (Adams' Aff., ¶ 6.)  Soon thereafter, Plaintiff and Adams saw the same employees working without blue flag protection as they were installing the propane tanks, and Hill was supervising them.  (Adams' Aff., ¶ 7.) Plaintiff told Kenny Francis, another supervisor, that Hill and the two car department employees were working without the proper blue flags.  (Pl.'s Dep., p. 246.)

Later the same day, Plaintiff submitted a Safety Improvement Suggestion/Observation Form ("SISO") about the events, stating:

> Supervisors should not allow a worker to work unsafe.  I observe[d] car department [workers] traveling with propane tank unsecure with a supervisor.  Also the track they were working on was not lock[ed] out.  Supervisors should be the example of safe working.  I pointed this out to supervisor.

(#D761.)  Then, about a week later, on January 13, 2002, Plaintiff wrote a letter to Williams stating:

> On 10-2-02 I submitted a safety observation stating, "I saw supervisor Dave Hill working with Don Brown in violation of Blue Flag lock out Protection." What discipline action was taken on Mr. Hill and Mr. Brown?

(#D761-2.)[4]  Both Hill and Brown are Caucasian.  Shortly thereafter, Williams tried to discuss the allegations with Plaintiff.  Williams believed the allegations in the letter (regarding Hill and Brown) were

---

[4]During his deposition, Plaintiff claimed that he believed Brown had been working with Hill on the track, in violation of the blue flag rule, which is why he inquired about discipline relating to Brown.  (Pl.'s Dep., pp. 163, 231-32.)

inconsistent with Plaintiff's safety observation (in which neither were mentioned).  (Williams' Dep., pp. 184-87.)

On January 28, 2003, Plaintiff wrote another letter to Williams stating:

> I ask again, what discipline action was taken on Dave Hill and Dave Brown for violation of blue flag rule, and what discipline action was taken on Dave Hill and Kenny Francis who did not report this violation to you?  Be advised, if you don't respond by 01-31-02 I will be seeking higher authority.  Please respond in writing.

(#D762.)  Francis is also a Caucasian supervisor.  Plaintiff also sent two other letters to Chambers, the manager of car maintenance, inquiring what discipline was doled out to Leyba (Hispanic) and Dombrowski (Caucasian).  (#D762.)  Chambers did not respond to Plaintiff's letters.

Based on these letters, Williams charged Plaintiff with fabricating a safety observation that Hill and Brown had violated the blue flag rule, and with making false statements about these employees.  (#D629.)  Williams directed Plaintiff to appear for an investigation for violating Rule S-1 of the Safety Rules.

Following Williams' decision to hold a disciplinary hearing, but before the hearing was held, Plaintiff again contacted human resources to complain about discrimination and retaliation.  (Wolfe's Dep. Ex. C; Pl.'s Dep., pp. 65-66.)  Plaintiff told Wolfe that the "rules [were] unfair," that he was being "singled out," that "they make up the rules as they go along" and that Plaintiff did not "want to be

harassed, singled out and targeted." (Wolfe's Dep. Ex. C.) Wolfe spoke with Plaintiff again on October 25 and 30, 2002, and Plaintiff again reported harassment tactics and racism. (Wolfe's Dep. Ex. D; Wolfe's Dep., pp. 53-54.) Wolfe claims he did not know Plaintiff was making a charge of discrimination or retaliation during any of these three conversations he had with Plaintiff. (Wolfe's Dep., pp. 55-57.) Plaintiff wrote Wolfe on February 4, 2003, stating he had filed a charge of discrimination, and objecting to either Williams or Chambers being the hearing officer for the investigation, alleging they allowed white co-workers to violate blue flag rules and then retaliated against Plaintiff after he pointed it out. (Wolfe's Dep. Ex. G.) Plaintiff believes Wolfe allowed the discrimination to happen, and he is not aware of anything Wolfe did to try to stop it. (Pl.'s Dep., pp. 175-76.)

During the hearing, Plaintiff admitted that he only saw Brown apply the appropriate protection, and that he did not see Brown do any work without blue flag protection. (#D598; Pl.'s Dep., p. 163.) Plaintiff explained he assumed that Brown was working in violation of the blue flag rule (because he saw Brown lock out the track), but if he had known that Brown had only placed the lock on the derail and did not work on the track, he would not have mentioned him in his letters. (Feb. 11, 2003 Hearing Tr., Ex. CC, #D1007, #D1018; Pl.'s Dep., pp. 232-33.) Hearing Officer Gerald Carr determined that Plaintiff had fabricated a safety observation involving Hill and Brown and the

-17-

statements made in his January 13 and 28, 2003 letters.  (#D533.)
EJ&E discharged Plaintiff for those false statements. (#D533, #D639.)


        Plaintiff appealed both of his last disciplines to the PLB.
Over a year later, on March 23, 2004, the PLB reversed the 30 demerits
issued for Plaintiff's blue flag violation because it was not clear
that the application of the blue flag was necessary based upon the
work being performed by Plaintiff. (#D771.)  The PLB found that there
was insufficient evidence to demonstrate that Plaintiff was on the
caboose and, therefore, that he was required to install blue flag
protection. (#D768-772.)  With regard to the allegations against Hill
and Brown, the PLB stated that "[t]he Claimant in this case seems to
have taken an accusatory shotgun approach in retaliation for what also
appears to be a somewhat less than affable relationship with Mr. Hill.
But, what is plain even to a novice observer is that one or more of
the allegations that were made were false, and most assuredly the
allegation, which references Brown." (#D766.)  Despite this finding,
the PLB determined that discharge was too harsh a penalty for
Plaintiff's dishonesty, and ordered him reinstated, but without back
pay. (#D687; #D758-767.)  Plaintiff was reinstated in February, 2004,
and returned to work in April, 2004.

        Plaintiff filed his first charge of discrimination with the Gary
Human Relations Commission ("GHRC") against EJ&E on February 3, 2003,
alleging he was discriminated against because of his race.  (#D788.)

-18-

The hearing officer, Carr, did not know about Plaintiff's complaints to EJ&E about Juriss or about Plaintiff's charge of discrimination with the GHRC at the time of the hearing.  (Carr Dec., ¶¶ 4-5.) Plaintiff filed this lawsuit on August 23, 2004.

Plaintiff's Harassment Claim - Hostile Work Environment

Plaintiff claims he was harassed because of his race in violation of section 1981 and Title VII (Counts I and V).  Because the Court evaluates section 1981 claims under the same rubric as Title VII claims, the Court will not address them separately.  *See Williams v. Waste Mgmt. of Illinois, Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004). In the context of Title VII, harassment involves conduct that unreasonably interferes with a person's work performance or creates an intimidating, hostile, or offensive work environment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

EJ&E argues that Plaintiff's harassment claim should be dismissed because:  (1) the claim is time-barred; (2) Plaintiff has not alleged facts sufficient to rise to the level of severity or pervasiveness required to establish a hostile work environment; (3) EJ&E exercised reasonable care to prevent and deal with any purported harassment; and (4) Plaintiff failed to exhaust his administrative remedies with respect to his harassment claim. Assuming, *arguendo*, that Plaintiff's harassment claim is not time barred or barred by the failure to exhaust administrative remedies, this Court finds that the facts as

-19-

alleged by Plaintiff fail to rise to the level of severity or pervasiveness required to establish a hostile work environment claim. This Court therefore focuses its analysis on EJ&E's third argument, and declines to address the other arguments regarding why Plaintiff's harassment claim may fail.

To establish a hostile work environment claim, Plaintiff must show:  (1) that his work environment was objectively and subjectively offensive; (2) that the harassment was based on his membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002).

A hostile work environment is one that is both objectively and subjectively offensive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  In other words, "[u]nder Title VII, a hostile work environment exists when conduct is so severe or pervasive that it is objectively hostile and the victim himself finds it abusive." *Henderson v. Irving Materials, Inc.*, 329 F. Supp. 2d 1002, 1008 (S.D. Ind. 2004) (citation omitted).  In evaluating whether a workplace is hostile, the Court must look at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Relatively isolated" instances of misconduct that are not severe will

not support a hostile environment claim.  *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) (citing *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993)).  The threshold for Plaintiff is high, as "the workplace that is actionable is one that is 'hellish.'"  *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

Plaintiff claims that he was made aware of the following allegedly racial slurs:

- Dieter Hilltrop, a co-worker, told Plaintiff that sometime in the mid-90's Juriss stated words to the effect of "[t]he problem in this country are the Jews and the niggers." (Pl.'s Dep., p. 57.)

- In approximately the Spring of 1995, Juriss told Hilltrop that "Hitler should have killed more Jews."  (Pl.'s Resp. to First Set of Interrogs., No. 1.)

- One of three co-workers (Plaintiff is unsure which one) reported to Plaintiff that Juriss imitated a monkey in the work area, with racially derogatory implications.  (Pl.'s Dep. pp. 59-60.)  Plaintiff did not see the display himself.  (Pl.'s Dep., p. 60.)

- Juriss told Plaintiff to his face that Plaintiff reminded him of the "Taco Bell dog" and referred to him as a "spider monkey."  (Pl.'s Dep., p. 76.)

-21-

- Juriss said words to the effect of "in the war with Iraq, they should have killed more babies over there." (Pl.'s Dep., p. 76.)

- One of three co-workers told Plaintiff in approximately 2000 that Juriss said, in reference to Cain, "fucking buffalo heads, they are all alike." (Pl.'s Dep., pp. 58-59; Pl.'s Resp. to First Set of Interrogs., No. 1.)

- One of three co-workers told Cain in approximately 2000 that Juriss called him a "dumb ass nigger." (Pl.'s Dep., p. 58; Pl.'s Resp. to First Set of Interrogs., No. 1.)

These statements were all allegedly made by Juriss during the approximate time period of 1995 to May, 2000, when Juriss ceased being Plaintiff's supervisor after EJ&E's investigation into Plaintiff's allegations. (Pl.'s Dep., p. 71; Wolfe Dec., ¶ 10.) Thus, Plaintiff bases his claim for hostile environment on 7 statements made over the course of approximately 5 years.[5]  Plaintiff admits that after Juriss was transferred, he never made any harassing comments to Plaintiff. (Pl.'s Dep., pp. 71-72.)

With the exception of calling Plaintiff to his face the "Taco Bell dog" and "spider monkey," and Juriss' statement that they should have killed more babies in Iraq, all of the other statements were made outside of Plaintiff's presence. (Pl.'s Resp. to Second Set of

---

[5]Plaintiff was hired by EJ&E on November 3, 1997.  Thus, two of these statements were likely made before Plaintiff even worked at EJ&E.

Interrogs., No. 4.)  Plaintiff admits that he learned of Juriss' other comments through his co-workers, and did not personally hear them. (*Id.*)

With regard to Juriss' statements about Jews and killing babies in Iraq, while inappropriate and offensive, these comments do not implicate Plaintiff's race.  Plaintiff's complaints are based upon his protected status as an African American.  In *Russell v. Eli Lilly & Co.*, No. TH01-0160-C T/H, 2002 WL 31427441, *5 (S.D. Ind. Oct. 16, 2002), the District Court for the Southern District of Indiana addressed a similar circumstance and found that "[o]ffensiveness alone is not enough.  The conduct complained of must be offensive because of Plaintiff's race."  In *Russell*, the Court found that the defendant's comment to plaintiff about her being "double jointed" did not refer to plaintiff's race, and the plaintiff failed to show that the alleged harassment was because of her race.  *Id.*  Although this Court "do[es] not discount the discomfort that slurs on ethnic groups other than one's own can cause for a worker," these inappropriate, but isolated comments do not rise to the level of an objectively severe or pervasive hostile environment.  *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F. 3d 464, 467 (7th Cir. 1998).  Similarly, Plaintiff has failed to show that Juriss' reference to him as the "Taco Bell dog," is a reference to his race as an African American.

The other statements at issue (with the exception of Juriss calling Plaintiff a "spider monkey," which will be addressed next),

were admittedly not made in the presence of Plaintiff.  EJ&E argues that these incidents that occurred outside of Plaintiff's presence cannot form the basis of a hostile work environment because Plaintiff had no first-hand knowledge that the comments were made.  Citing to mainly Second Circuit case law, Plaintiff claims that Juriss' comments can still constitute unlawful racial harassment even if Plaintiff did not personally hear them.

First, the Court notes that neither party directly addresses the obvious hearsay issue with these statements.  Plaintiff has only cited to his own deposition testimony and responses to interrogatories, claiming that one of three possible co-workers told him that Juriss made these statements about Plaintiff.  The Court is unaware of any deposition testimony or statements made by these three co-workers in the record.  Hearsay statements are not competent evidence that may be used to oppose a motion for summary judgment.  *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003).  Thus, this Court cannot consider the statements made outside of Plaintiff's presence in evaluating whether a hostile work environment existed.

Even putting aside the hearsay nature of these statements, the Court finds that they are not severe or pervasive enough to establish a hostile environment.  EJ&E cites to *Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 642 (7th Cir. 2005), in which the Seventh Circuit held that "[b]ecause most of the offensive comments giving rise to the plaintiff's claim were made outside of her presence and unbeknownst

-24-

to her, and because those that were directed at her were relatively isolated, we affirm the grant of summary judgment in the defendants' favor on her hostile work environment claim."  The major difference between this case and *Whittaker*, however, is that in *Whittaker*, "there [was] no evidence that [the plaintiff] was aware of these defendants' remarks during her tenure with [defendant]."  *Id.* at 645.  In this case, according to Plaintiff, he was made aware of the remarks during the time period of 1999-2000.

This case is therefore more analogous to *Ngeunjuntr*, in which the Seventh Circuit rejected a hostile work environment claim where most of the offensive comments giving rise to the claim were not directed at the plaintiff, and those that were directed at the plaintiff were isolated. 146 F.3d at 467; *see also Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (holding objectively hostile work environment will not be found where "[m]ost of the conduct that forms the basis of [a plaintiff's] claim consists of derogatory statements made by supervisors or co-workers out of her hearing," and the rest were "isolated and not particularly severe."). Like *Ngeunjuntr* and *Mannie*, in this case, almost all of the comments at issue were made outside of Plaintiff's presence.

Although inadmissible hearsay, the Court notes that Juriss' alleged statement outside the presence of Cain that he was a "dumb ass nigger" is particularly egregious.  The Court recognizes, as the Seventh Circuit has held, that "[p]erhaps no single act can more

-25-

quickly alter the conditions of employment and create an abusive working environment . . . than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (quotation and citations omitted). However, in *Rodgers*, the plaintiff's supervisor used this word in the plaintiff's presence twice. This Court certainly does not condone Juriss' alleged use of this word, which is undeniably a pejorative racial epithet, but recognizes that in this case, the word was allegedly only stated once about Plaintiff, in his absence. The use of this term could of course contribute to a hostile work environment. However, in this case, the small number of harassing remarks based upon Plaintiff's race, spread out over approximately five years, coupled with the fact that most of the remarks were made outside of Plaintiff's presence, leads this Court to believe that the remarks are not severe or pervasive enough to be judged objectively hostile.

The Court is therefore left with the one comment made to Plaintiff that can be interpreted as a racially discriminatory comment - that Plaintiff was a "spider monkey." The comment is inappropriate, but isolated. Plaintiff puts forth no evidence that Juriss repeatedly called him this name, or that it affected Plaintiff's ability to function at work. Therefore, like the Court in *Ngeunjuntr,* where comments were made outside of Plaintiff's presence, and one comment - that plaintiff should "go back East" - was directed to the plaintiff,

-26-

"given the totality of the circumstances we would have to conclude that the evidence presented does not reveal an environment sufficiently hostile that a reasonable person would find it abusive, even if [Cain] himself did." *Ngeunjuntr*, 145 F.3d at 467.

Given the totality of circumstances, this Court concludes that the evidence presented does not reveal an environment sufficiently hostile that a reasonable person would find it abusive. We do not have in the record "the quantity, frequency, and severity" of racial slurs that "create a work environment so hostile as to discriminate against the minority employee." *Vore v. Indiana Bell Tel.*, 32 F.3d 1161, 1164 (7th Cir. 1994). The evidence is insufficient to show that "the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of [Cain' s] employment and create an abusive working situation." *Harris*, 510 U.S. at 21 (quotations and citations omitted). Thus, the facts in the record do not give rise to a claim of hostile work environment under Title VII or section 1981, and EJ&E's motion for summary judgment is **GRANTED** on these claims.

Plaintiff's Discrimination Claim - Title VII and Section 1981

EJ&E argues that Plaintiff's discrimination claim should be dismissed for three reasons: (1) Plaintiff cannot establish a *prima facie* case of unlawful discrimination; (2) Plaintiff cannot establish that EJ&E's legitimate non-discriminatory reason for assessing

-27-

discipline against him was pretextual; and (3) Plaintiff's claims with respect to discipline which occurred in 2000 and earlier are time-barred.  Plaintiff claims that each of these arguments fail.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to fail to hire, discharge, or otherwise discriminate against any individual because of the individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-3(a).  Under section 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981.  Under either theory, Plaintiff must establish that he is the victim of intentional discrimination based upon his race or national origin.  *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999); *see also Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002) (noting that Title VII and section 1981 discrimination claims are analyzed in the same manner).

As noted by Cain, a plaintiff alleging employment discrimination can defeat summary judgment in one of two ways:  (1) he can submit evidence, either direct or circumstantial, of discriminatory motivation sufficient to create a triable issue; or (2) he can establish a *prima facie* case under the burden-shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).[6]

_____

[6]To meet his *prima facie* burden under the *McDonnell Douglas* burden shifting analysis, Plaintiff must establish the following: (1) he was a member of a protected class; (2) he was performing

Plaintiff may establish this discrimination through either the "direct" or "indirect" method of proof. *Id.*

When using the direct method of proof, Plaintiff may present either direct or circumstantial evidence to prove his claim. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Direct evidence is evidence that would allow the trier of fact to believe the fact in question without making inferences or presumptions. *Id.* Direct evidence is usually limited to situations where the decision maker admits that his actions were based upon the prohibited animus. *Id.*

On the other hand, the second type of evidence permitted under the direct method of proof relies on circumstantial evidence that allows the trier of fact to infer that intentional discrimination occurred by the decision maker. *Id.* Circumstantial evidence consists of "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). In other words, a plaintiff may prevail by constructing a convincing mosaic of circumstantial evidence that

---

his job satisfactorily; (3) the employer took an adverse employment action against him; and (4) the employer treated at least one similarly situated employee outside of his protected class more favorably. *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004).

"allows a jury to infer intentional discrimination by the decision-maker." *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Troupe*, 20 F.3d at 737).  The circumstantial evidence must lead the trier of fact directly to the discriminatory reason for the employment action. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

The Seventh Circuit recognizes three types of circumstantial evidence of intentional discrimination:  (1) suspicious timing, ambiguous statements, behavior or comments directed at other employees in the protected group, and other "bits and pieces from which an inference of discriminatory intent might be drawn . . .; (2) evidence "whether or not rigorously statistical," that employees similarly situated to the plaintiff but outside the protected class received systematically better treatment; or (3) evidence that the plaintiff was qualified for a job in question, but passed over in favor of, or replaced by, a person not in the protected group and the employer's stated reasons for the difference in treatment is not worthy of belief. *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720-21 (7th Cir. 2005) (citing *Troupe*, 20 F.3d at 736).

Plaintiff first attempts to submit both direct and circumstantial evidence of discrimination under the direct method to defeat EJ&E's motion for summary judgment.  With regard to direct evidence, Plaintiff claims that Juriss' statements to Roberts that Juriss made accusations against Plaintiff in 1999 because Juriss was "trying to

-30-

teach Plaintiff a lesson," (Roberts' Dep., pp. 148-49), and Juriss'
racist statements, including referring to Plaintiff as a "nigger,"
constitute discrimination per se.  As found earlier, however, this
Court cannot take into consideration Plaintiff's alleged statement
that Plaintiff was referred to a "nigger," because the statement was
made outside the presence of Plaintiff, and constitutes hearsay.
Juriss' statement that he made certain accusations to teach Plaintiff
a lesson in 1999 may show that Juriss discriminated against Plaintiff
to some degree.  However, because Juriss ceased being Plaintiff's
supervisor in May of 2000, this Court is unsure how this comment
relates to the much more serious demerits that Plaintiff received at
the end of his employment with EJ&E, and the final accusation of
dishonesty and discharge in February 2003.  This Court agrees with the
finding in *Selan* that an event this remote in time cannot serve as
direct evidence of discrimination.  *See, e.g., Selan v. Kiley*, 969
F.2d 560, 567 (7th Cir. 1992) (noting that two-year gap between
discriminatory acts "negates the contention that the acts were
continuous or connected.").

     Plaintiff presents a much stronger case under the direct method
by pointing to circumstantial evidence.  Although no one piece of
circumstantial evidence seems definitive, when taken together, it does
form a convincing mosaic that allows a decision maker to infer
intentional discrimination.  *See Troupe*, 20 F.3d at 736 (noting that
each type of circumstantial evidence can be used on its own or

-31-

together with other types of circumstantial evidence to establish discrimination.").

First, Plaintiff tries to rely on statistics. Plaintiff attempts to show that EJ&E has a pattern or practice of excluding African Americans from its workforce and its managerial ranks. For example, from 1999 to 2004, EJ&E did not have any African American managers in the Mechanical Department. (Group Ex. D.) Although the City of Gary, Indiana, where EJ&E is located, has a population of 84% African Americans, from 2000 through 2004, Plaintiff claims African Americans were under represented in the work force. For example, in 2003, 7 of the 122 employees in EJ&E's Mechanical Department were African American (5.7%), and in 2004, 8 of the 119 employees in EJ&E's Mechanical Department were African American (6.7%). (Group Ex. D.) Plaintiff also shows that statistically, African Americans are twice as likely as white employees to be terminated (Def.'s Sec. Supp. Resp. to Interrog. Nos. 1 and 2; Ex F and accompanying charts).

EJ&E argues that Plaintiff's use of statistics is improper. For example, EJ&E argues that other factors should be considered that may account for statistical disparities, including the relevant labor market, or the number of qualified and interested African Americans (instead of just looking at the population in Gary, Indiana), and examining why some African Americans were terminated, and why others were not promoted. The Court agrees that numbers may not be considered in a vacuum, and based upon only the statistics presented

by Plaintiff, it does not believe that discrimination is the only implication that could by drawn by a fact finder.  However, the statistics presented by Plaintiff in its statement of genuine issues of material fact, along with other types of circumstantial evidence, together create a question of material fact as to whether Plaintiff was a victim of intentional discrimination.

Plaintiff also contends that EJ&E has selectively enforced its rules against African American employees.  Plaintiff lists evidence of what it claims to be numerous instances of alleged superior treatment for whites, and this Court will review a few of the more pertinent instances.  When Dombrowski (white) violated the blue flag rule on October 2, 2002, he had previously failed four proficiency tests; however, Dombrowski received no demerits and was not scheduled for any disciplinary hearings.  (Group Ex. K.)  Although there is some conflicting testimony, Leyba (Hispanic) stated in an affidavit that he never received any type of written warning or written reprimand for having violated the blue flag rules on October 2, 2002.  (Leyba Aff., ¶ 5.)  On September 12, 2002, H.L. Florence, a white employee of the locomotive department, failed a proficiency test for violating the blue flag rule and only received a verbal reprimand.  (Group Ex. II.)  Additionally, Plaintiff points to Plaintiff's former supervisor, Juriss, who was found to have committed a serious offense by violating EJ&E's harassment policy, yet he was not terminated.  Finally, Williams admitted that "if you dismiss every individual that violated

one of these things [in Rule S-1] . . . there would not be anybody working for the railroad." (Williams' Dep., p. 103.)  As Judge Simon found in *Titus v. Elgin, Joliet & Easter*, No. 2:01-cv-424PS, 2005 WL 1432193, * 5 (N.D. Ind. June 16, 2005), "intermittent enforcement" of a rule could lead "a jury [to] infer that the rule was only used as a justification for firing an employee for other reasons."  This possible selective enforcement, which could be interpreted by a jury as being racially discriminatory, is a portion of the "convincing mosaic" of circumstantial evidence that allows a decision maker to infer intentional discrimination.  *Rhodes*, 359 F.3d at 504.

Plaintiff also presents other evidence adding to the mosaic allowing an inference of discrimination.  Plaintiff was disciplined within a month of his complaints to Williams in 1999 and shortly after his complaints to Williams in 2003, and within a month of having filed a charge with the GHRC.  Plaintiff also has presented evidence from which a fact finder could deduct that EJ&E's human resources did nothing to address, investigate, or stop the alleged continuing discrimination or retaliation of which Plaintiff repeatedly complained.

In sum, this Court believes Plaintiff has presented a convincing mosaic of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker." *Rhodes*, 359 F.3d at 504.  Plaintiff presented statistical evidence from which a fact finder could draw the conclusion that African Americans were

systematically discriminated against by EJ&E, evidence from which a fact finder could conclude that white employees were disciplined more leniently than African Americans, evidence from which a fact finder could determine that the rules were not equally enforced, and evidence from which a fact finder could determine that the company failed to address Plaintiff's repeated requests for help.  As the Court found in *Titus*, here, Plaintiff has set forth enough doubt against the practices at EJ&E that "the ultimate judgment should be left to a jury, who could reasonably find that [EJ&E] intentionally discriminated against [Plaintiff]."  *Titus*, 2005 WL 1432193, at * 6. As such, he has established a *prima facie* case of discrimination under the direct method.

The Court notes that under the rigorous standard for setting forth a similarly situated employee under the indirect method, (Plaintiff must show he is similarly situated with respect to performance, qualifications, and conduct), it doubts that Plaintiff has shown that the comparables are similarly situated in all respects. However, the direct method "does not require [Plaintiff] to fulfill the similarly-situated prong."  *Titus*, 2005 WL 1432193, at *5. "Rather, all it requires is a showing sufficient for a jury to find intentional discrimination by the decisionmaker." *Id.* (citing *Rhodes*, 359 F.3d at 504).

Finally, EJ&E argues that discipline against Plaintiff that was outside the applicable statutes of limitations (discipline prior to

-35-

April 7, 2002 under Title VII and discipline prior to August 23, 2000 under Section 1981), cannot form the basis of Plaintiff's claims. However, as recognized by Plaintiff, in *Morgan*, the Supreme Court specifically noted that employees may rely on time-barred acts of discrimination as background evidence in support of timely claims. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also West v. Ortho-McNeill Pharm. Corp.*, 405 F.3d 578, 581 (7th Cir. 2005) (noting that *Morgan* allows plaintiffs to use time-barred acts to prove timely claims of discrimination). Accordingly, this Court has considered those acts prior to August 23, 2000, as background evidence.

For all of these reasons, EJ&E's motion for summary judgment on Plaintiff's claim of race discrimination under Title VII and Section 1981 is denied.


Plaintiff's Retaliation Claim - Title VII and Section 1981

EJ&E argues that summary judgment is warranted on Plaintiff's retaliation claim, asserting that it is time-barred and that Plaintiff has failed to establish a *prima facie* case of retaliation. Plaintiff, in response, counters that the retaliation claim is timely, and that it can establish retaliation through both the direct method and indirect method.

First, EJ&E contends that "Plaintiff's claim that the discipline he received in January and February 2003 in retaliation for complaints

-36-

he made two to three years earlier is simply untenable." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J., p. 20.) However, this is not a correct characterization of Plaintiff's claim. Plaintiff alleges that EJ&E retaliated against him based upon complaints he made to Williams in 1999, complaints he made to human resources in 2000, complaints he made to human resources in 2002 and 2003, and complaints he made to Williams in January 2003, and his filing of a charge of discrimination with the GHRC in February 2003. As such, the Court believes the retaliation claims are within the applicable statute of limitations.

Title VII's anti-retaliation provision forbids employers from taking an adverse employment action against an employee for opposing impermissible discrimination. 42 U.S.C. § 2000e-3(a). As with Plaintiff's discrimination claim, he may establish a retaliatory discharge claim under Title VII in one of two ways: (1) the complainant may present direct proof of discriminatory intent (the "direct method"), or (2) he may use the "indirect method" which applies the burden-shifting articulated in *McDonnell-Douglas*.

As with Plaintiff's discrimination claim, Plaintiff has put forth enough circumstantial evidence to compose a convincing mosaic that allows a jury to infer intentional retaliation. *See Volovsek v. Wisconsin Dep't of Agr., Trade and Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003). Suspicious timing constitutes circumstantial, or indirect, evidence to support a claim of discrimination. *Pugh v. City*

*of Attica, Indiana,* 259 F.3d 619, 628 (7th Cir. 2001).  In this case, within a short time frame after Plaintiff made each of his complaints either to human resources or to EJ&E supervisors, he suffered some type of discipline.  Additionally, because the PLB determined that discharge was too harsh a penalty for Plaintiff's dishonesty, and eventually reinstated Plaintiff without back pay, it is possible for a fact finder to conclude that Plaintiff's discharge was a result of his continuous registration of complaints over his years of service at EJ&E.  Another piece of circumstantial evidence adding to the mosaic of inferring intentional retaliation is Williams' admission that if EJ&E fired every employee who violated Rule S-1, EJ&E would have no employees left. (Williams' Dep., p. 103.)

These pieces of evidence, combined with the statistical evidence presented by Plaintiff, create a material question of fact that the fact finder must resolve.  Therefore, EJ&E's motion for summary judgment on Plaintiff's claim of retaliatory discharge under Title VII and Section 1981 is denied.


Plaintiff's State Law Claim of Defamation

To state a cause of action for defamation under Indiana law, Plaintiff must identify a defamatory statement and allege:  (1) the communication has a defamatory imputation;  (2) malice;  (3) publication; and (4) damages.  *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992).  Plaintiff claims that the following statements

made about Plaintiff constitute defamation:  Hill's accusation that Plaintiff violated the blue flag rule on October 1, 2002 (Pl.'s Stmt. of Fact, ¶ 156); Hill repeated this allegedly false statement to Williams (*Id.* ¶ 157); this false accusation was repeated to other EJ&E managers (*Id.* ¶ 158); on January 30, 2003, Williams falsely accused Plaintiff of fabricating a safety violation against his co-employees (*Id.* ¶ 159); and these false accusations of dishonesty were repeated to coworkers who were called during the investigation (*Id.* ¶ 160).

EJ&E argues that Plaintiff's defamation claim is preempted by the RLA because all of the challenged statements related to the disciplinary proceedings. *See Hull v. Cent. Transp.*, 628 F. Supp. 784, 789 (N.D. Ind. 1986) (explaining that a defamation claim that arises out of statements made during the grievance procedure is preempted by the Labor Management Relations Act, the RLA's statutory counterpart).  In response, Plaintiff argues that defamation claims arising in the course of labor disputes are not preempted by federal labor law if the statements were made with knowledge of their falsity or with reckless disregard of whether or not they were true.

It is true that "[s]tate defamation claims arising from statements made in labor disputes are preempted by federal labor law unless those statements are made with knowledge of their falsity or with reckless disregard for the truth." *Chicago District Council of Carpenters Pension Fund, v. Reinke Insulation*, No. 01 C 8102, 2005 WL 1838364, at *4 (N.D. Ill. Aug. 2, 2005) (citing *Linn v. United Plant*

*Guard Workers of America*, 383 U.S. 53 (1966)).  In *Linn*, the Supreme Court limited defamation claims due to concerns for "unwarranted intrusion upon free discussion envisioned" under federal labor laws. *Id.*  The Court therefore imposed a malice requirement, making the plaintiff prove that a publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* (citing *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 281 (1974)).

On a summary judgment motion in a defamation action in which this malice standard applies, "the plaintiff is not only required to produce evidence creating a genuine issue of material fact, but is additionally required to produce evidence that a jury could find is clear and convincing evidence that the defendant acted with knowledge that the statements were false or with reckless disregard for the statements' truth or falsity." *Reinke*, 2005 WL 1838364, at *4.  Thus, Plaintiff has the burden of demonstrating by clear and convincing evidence that EJ&E knew the accusations it made during and surrounding the disciplinary hearings at issue were false.  Here, the Court finds that Plaintiff has not met this standard.  With regard to the accusation of dishonesty, although the PLB stated that the sanction of dismissal was too harsh, it determined in its review that Plaintiff was dishonest.  Thus, there is simply no evidence the EJ&E knew that the last hearing and events surrounding it were false accusations against Plaintiff.  Although the PLB eventually reversed the finding

that Plaintiff had violated the blue flag rule in 2002, again, Plaintiff has put forth no clear and convincing evidence that the investigation was undertaken with knowledge that the accusations were false against Plaintiff.

Consequently, EJ&E's motion for summary judgment on Plaintiff's defamation claim is warranted.


CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is **GRANTED IN PART and DENIED IN PART.**  The motion is **GRANTED** as to Plaintiff's claims for harassment on the basis of his race in violation of section 1981 and Title VII (Counts I and V), and Plaintiff's defamation claim (Count IV), and the Clerk is **ORDERED** to **DISMISS** those claims **WITH PREJUDICE.**  The motion is **DENIED** as to Plaintiff's claims of discrimination in violation of section 1981 and Title VII (Counts I and V), and retaliation in violation of section 1981 and Title VII (Counts II and VI), and these claims remain pending.


**DATED:  January 19, 2006**                 S/RUDY LOZANO, Judge
                                              **United States District Court**

-41-